## COMMONWEALTH *vs.* MICHAEL CHARTIER.

No. 95-P-1893.

Bristol. September 16, 1997. - November 5, 1997.

Present: KASS, FLANNERY, & SPINA, JJ.

*Evidence,* Prior misconduct, Judicial discretion, Prior conviction. *Practice, Criminal,* Instructions to jury, Comment by prosecutor, Required finding. *Abuse Prevention. Malicious Injury to Property.*

At the trial of a complaint alleging the defendant violated a domestic abuse protective order, the judge properly allowed evidence of the defendant's prior harassing conduct toward the victim and her family, with appropriate limiting instructions, as illuminating a pattern or course of conduct by the defendant. [760-761]

At the trial of complaints for malicious destruction of property and violation of a domestic protective order, the judge properly admitted in evidence the defendant's intervening convictions of violating a domestic abuse protective order and making annoying phone calls, for purposes of impeachment of the defendant's credibility. [761-763]

At a criminal trial in which the judge forcefully instructed that the jury were to consider evidence of the defendant's prior convictions only on the issue of credibility and not as evidence of guilt, there was no substantial risk of a miscarriage of justice created by the prosecutor's arguably improper comments in closing argument that tended to suggest that the convictions were substantive evidence reflecting on the defendant's credibility. [763-765]

At the trial of a complaint for violation of a G. L. c. 209A order, the Commonwealth introduced sufficient evidence that the defendant had knowledge of the issuance of the order to warrant the judge's denial of the defendant's motion for a required finding of not guilty. [765-766]

At the trial of a complaint for malicious destruction of property, the Commonwealth introduced sufficient evidence to warrant the judge's denial of the defendant's motion for a required finding of not guilty. [766]

COMPLAINT received and sworn to in the Attleboro Division of the District Court Department on January 9, 1995.

On transfer to the jury session of that division, the case was tried before *Francis T. Crimmins,* J.

*Audrey S. Gordon* for the defendant.

*David B. Mark,* Special Assistant District Attorney, for the Commonwealth.

KASS, J. During his trial on charges of malicious destruction of property and violation of a domestic abuse protective order issued under G. L. c. 209A, § 3, the defendant Michael Chartier took the witness stand in his defense. On cross-examination of Chartier, the Commonwealth placed in evidence his prior convictions, three months earlier, of violating a c. 209A protective order and of making annoying telephone calls. The prosecutor, while making his closing argument, twice referred to the prior c. 209A conviction as evidence tending to prove the falsity of Chartier's trial testimony, which was that he had put behind him a romantic attachment to Michelle Botelho, that he had become indifferent to her, and had moved on with his life. That use of a prior conviction, admitted under G. L. c. 233, § 21, in a substantive sense rather than solely to impeach the defendant's credibility was probably a prosecutorial error. Defense counsel did not, however, object to the prosecutor's argument. Of several questions raised by the defendant on appeal, the most difficult one is whether, notwithstanding the lack of an objection at trial, the prosecutor's argument produced a substantial risk of a miscarriage of justice. Close behind that issue in difficulty is whether the trial judge acted within his discretion in permitting the prosecution to place in evidence a prior conviction of an offense the same as that for which the defendant was being tried.

*Facts.* These are the facts the jury of six could have found, viewing the evidence in the light most favorable to the Commonwealth. Chartier and Michelle Botelho dated regularly from October, 1990, to May, 1993, when Botelho reduced their status to just friends. Later that year, in August, Botelho decided that friendship was no longer sustainable and broke off the relationship entirely. Chartier took the breach badly. There was an occasion when he skulked behind a neighbor's garbage can and watched as Botelho came home with a male companion. Later, he telephoned Botelho and demanded to know who the escort had been and why he had kissed her. When an uncle of Botelho's died, Chartier went to the wake and while there, asked Botelho whom she was seeing. He took to following Botelho in his car; he drove by her house honking his horn. He turned up at the gym (in a local YMCA) where she worked out. On December 13, 1993, Botelho obtained a preliminary protective order under G. L. c. 209A, § 3, and that order, after a hearing on December 27, was extended for a year.

In April and May of 1994, the Botelho family began receiving nuisance telephone calls traceable to Chartier, including one in which he said, "Michelle, I'm going to get you." Chartier resumed following Botelho around at the gym and elsewhere. On Christmas Eve in 1994, the Botelho family attended a midnight Mass. Upon leaving church, Botelho's father, Manuel,[1] noticed that the lights of his grey BMW automobile were blinking. The car was equipped with an anti-theft system that would cause the car, if tampered with, first to sound an alarm for twenty seconds and then to flash its headlights for five minutes. Michelle and Manuel spotted Chartier running "from behind cars" toward the church. Manuel gave chase and caught up with Chartier on a handicap access ramp to the church. Manuel grabbed Chartier by his jacket and Chartier slipped out of it and away. Before Chartier departed, Manuel had said to him, "You're not supposed to be close to the family. You have a court order." To that Chartier replied, "Prove it. Prove it. You could never prove it." Manuel also said, "You broke my windshield," to which Chartier again replied, "Prove it. Prove it."[2]

Before turning to the question we identified in the opening paragraphs of this opinion, we consider several other issues raised by the defendant.

1. *Admission of evidence of prior harassing conduct.* The government, over objection, introduced evidence of the harassing conduct described above. That evidence, the defense urges, was improperly received because it violated the prohibition against admitting evidence of prior misconduct to show the defendant's inclination to committing the crime charged. *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985). *Commonwealth* v. *Sapoznik*, 28 Mass. App. Ct. 236, 243 (1990). Evidence of prior misconduct may be received, however, if it illuminates a pattern or course of conduct by the defendant. *Commonwealth* v. *Barrett*, 418 Mass. 788, 793-794 (1994). *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 103 (1993). Chartier's reactions to the dissolution of the attachment with Botelho played just such a clarifying function. The conduct with which Chartier

---

[1]We intend no disrespect by the use of first names but do so to distinguish Manuel Botelho from his daughter, Michelle.

[2]Chartier's version of events denied harassing behavior and described a quite different conversation between him and Manuel outside the church on Christmas Eve.

was charged might seem an inexplicable act of destruction if carried out in a vacuum but made some sense in the context of his aggrieved state of mind and jealous behavior. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269-270 (1982); *Commonwealth* v. *Gil*, 393 Mass. 204, 215-216 (1984); *Commonwealth* v. *Almeida*, 42 Mass. App. Ct. 607, 615-616 (1997). See also *Commonwealth* v. *Bryant*, 390 Mass. 729, 744 (1984); *Commonwealth* v. *Robertson*, 408 Mass. 747, 750-751 (1990); *Commonwealth* v. *Myer*, 38 Mass. App. Ct. 140, 143-144 (1995).

In exercising discretion to admit evidence of prior misconduct for contextual purposes, the judge is to weigh the probative value of the prior conduct against its distorting impact. *Commonwealth* v. *Robertson*, 408 Mass. at 750. *Commonwealth* v. *Martino*, 412 Mass. 267, 280-281 (1992). Here, the trial judge reasonably decided that the prior conduct evidence was necessary to give the jury the whole picture. His decision represents a category of evidentiary rulings that an appellate court does not disturb except in cases of palpable error. *Id.* at 280. Contrast *Commonwealth* v. *Picariello*, 40 Mass. App. Ct. 902, 903-904 (1996). As the acts described had their inception in the breakup of Botelho and Chartier, none is remote in the temporal or connectedness sense. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 n.13 (1986); *Commonwealth* v. *Calcagno*, 31 Mass. App. Ct. 25, 27-28 (1991).

As to how the jury were to consider the evidence of prior bad acts, the judge delivered a limiting instruction during the course of his charge to the jury. Defense counsel had pressed for a more contemporaneous limiting instruction, but had not been able to suggest what it was that he wanted the judge to say. The timing of a limiting instruction, which involves management of the trial, rests in the discretion of the trial judge. *Commonwealth* v. *Robinson*, 24 Mass. App. Ct. 680, 687 (1987). In his charge, the judge told the jurors that they could not use prior bad acts evidence "as a substitute for proof that the defendant committed the crimes charged . . . nor . . . as proof that the defendant had a criminal personality or a bad character . . . you may not use [the evidence of prior bad acts] to conclude that if the defendant committed the other acts, then he must also have committed these charges."

2. *Admission of prior conviction.* In *Commonwealth* v. *Maguire*, 392 Mass. 466, 470-471 (1984), the court established that a

trial judge's exercise of discretion in admitting evidence of a prior conviction under G. L. c. 233, § 21, was subject to review. Substantial similarity between the crime of which the defendant has previously been convicted and the crime for which he is being tried is a major factor in deciding whether the prior conviction ought to come in; i.e., the closer the similarity, the more the likelihood of unfair prejudice. *Id.* at 471.

During cross-examination of Chartier, the prosecution, over a defense objection, was allowed to introduce Chartier's convictions on November 14, 1994, of violating a domestic abuse protective order issued under G. L. c. 209A and making annoying telephone calls. As to one of the counts against Chartier in the instant case, that which charged violation of a domestic abuse protective order, the prior conviction was of the very same crime (and recently committed). The judicial tilt, under the *Maguire* opinion, would be toward exclusion. See *Commonwealth* v. *Elliot*, 393 Mass. 824, 832-834 (1985); *Commonwealth* v. *Reid*, 400 Mass. 534, 538-539 (1987); *Commonwealth* v. *Preston*, 27 Mass. App. Ct. 16, 23 (1989). But there is not a rule of per se exclusion of a prior conviction substantially similar to that for which the defendant is on trial. *Commonwealth* v. *Fano*, 400 Mass. 296, 304 (1987). *Commonwealth* v. *Reid*, *supra* at 538-539; there remains the application of the sound discretion of the judge.

We think that residue of discretion does not vanish when the prior conviction is for the same crime rather than for one substantially similar. The trial judge's duty is still to balance unfair prejudice and utility to the jury. Chartier's defense was that he did not touch Manuel Botelho's car; that he was in the church parking lot because, after attending Mass, he was looking for a friend, and that he had long since put Michelle Botelho out of his life. The trial turned very much on which witnesses were to be believed: Michelle and Manuel Botelho or Chartier. Impeachment of Chartier as a credible witness would be a significant factor. The idea underlying G. L. c. 233, § 21, is that a conviction of a prior crime is a valid measure of the truthfulness of a witness, i.e., willingness to violate law translates to willingness to give false testimony, and it is solely for that purpose that the evidence of a prior conviction is received. See *Commonwealth* v. *Elliot*, 393 Mass. at 835 (Lynch, J., dissenting). That jurors, properly instructed, use a prior conviction only for that limited purpose may not be our most plausible

legal fiction, see *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681 (1974) (Hennessey, J., concurring), but we adhere to it — not least because application of the statute so requires. Chartier's c. 209A conviction and the simultaneous annoying phone call conviction were his only prior convictions; the judge did not have the option of admitting a prior conviction of an unlike crime (the violation of the protective order and the annoying telephone calls were yoked in one certificate of conviction and were both like the crime being tried), while excluding receipt in evidence of a prior conviction for a similar crime. We conclude that the trial judge acted within his discretion in admitting evidence of Chartier's prior conviction.

3. *Prosecutor's references to the prior convictions in closing argument.* Twice during his closing argument the prosecutor referred to the prior convictions. On the first occasion, he said:

> "[T]here were a series of telephone calls from Mr. Chartier. We do know this, ladies and gentlemen, we do know that he was charged with that, we do know that he was convicted of that; he told you that from the witness stand. You're going to have that document with you in the jury room. If he's so indifferent as he said, indifferent, if he's so indifferent, if he's moved on with his life, what's all that about?"

Later, the prosecutor returned to the theme:

> "This man took the witness stand and told you there are no problems, he's indifferent, he's moved on with his life; but if that's true, then why the restraining order, why the conviction, and why the incident on Christmas Eve?"

On one level, the prosecutor's comments are that the jury should consider the prior convictions in deciding whether they believe the defendant's testimony. On another level, the prosecutor, however, is asking the jury to look at the offenses involved in the prior convictions as substantive evidence that put the lie to Chartier's testimony that he was no longer carrying the torch for Botelho, i.e., something beyond the idea that a person who has been convicted of a crime is for that reason alone less credible. At that, the use of Chartier's prior conviction in a substantive sense was aimed at Chartier's credibility. Assuming that the prosecutor strayed over the boundary of permissible argument,

there was, however, no objection by defense counsel. That is not astonishing. Counsel may have preferred not to highlight the convictions in the presence of the jury or, as the erroneous comments were fleeting and wrapped inside general comments about the defendant's credibility, the improper references may have escaped notice.[3]

The jurors were not permitted to see the certificate of conviction until after they were instructed by the judge. As to that certificate, the judge told the jurors:

> "You heard the evidence, and I told you we have Commonwealth's Exhibit Number 19, you heard evidence that the defendant was previously convicted of a crime, and you'll see in Commonwealth's Exhibit Number 19 that on November 15 of 1994 that there were — there's a record that purports that there [were] guilty findings and there's sort of a "G" by someone who writes like John Hancock or something, and a judge's name there on two counts, and there's two offenses listed, and it purports to show that at the Fall River District that the defendant was guilty of two offenses and the date of that disposition is November 15th of 1994.

> "You may consider that information only for the purpose of helping you to decide whether or not to believe his present testimony when he took the stand yesterday, and how much weight, if any, to give it, to give the testimony, because you have to weigh the credibility of all the witnesses. So you may not draw any inferences of guilt on these offenses that are charged because of his prior conviction on November of 1994.

> "The fact that the defendant was once found guilty of another crime doesn't mean that he's guilty of this charge, and you must not consider the prior conviction to be any indication of guilt on either one of the two charges before you in court here today.

> "You may consider the defendant's prior convictions solely to help you determine whether or not he is a truth-

---

[3]Defense counsel did object to another portion of the prosecutor's argument, and the judge delivered a curative instruction on the spot.

ful witness. So that just is another factor with all those other factors that I told you about in assessing the credibility of the other witnesses."

Three times, the reader will have noticed, the judge told the jury not to use the prior convictions for any purpose other than as an aid in judging Chartier's credibility. The limiting instruction was forceful and to the point. Notwithstanding justifiable skepticism about the effect of limiting instructions expressed, for example, in the concurring opinion of Justice Hennessey in *Commonwealth* v. *DiMarzo, supra,* our practice is to presume that juries follow instructions. *Commonwealth* v. *Chubbuck,* 384 Mass. 746, 753 (1981). *Commonwealth* v. *Meadows,* 33 Mass. App. Ct. 534, 539 (1992). In light of the judge's limiting instruction, we think the improper portion of the prosecutor's closing argument does not require reversal of the judgments; i.e., there is not a substantial risk of a miscarriage of justice.

4. *Motion for required finding of not guilty.* (a) *As to violation of the c. 209A order.* Chartier argues that the Commonwealth failed to prove that he had knowledge of the extended c. 209A protective order and that, therefore, he was entitled to a required finding of not guilty on the charge of violating the protective order. At the close of the Commonwealth's case, evidence had been presented that Chartier had been served with a preliminary protective order dated December 13, 1993, and that Chartier had not appeared at the court hearing on December 27, 1993, of which the preliminary order had notified him. At the conclusion of that hearing, a District Court judge extended the protective order to December 27, 1994. See G. L. c. 209A, §§ 3 & 4. The preliminary order gave Chartier notice of what would be in an extended order, unless he were able to persuade the court at the hearing of which he had notice that the factual basis for issuance of the preliminary order had not existed. Chartier chose not to attend that hearing. He cannot, by avoiding the hearing and, thereby, further notification, defend on the basis of lack of notice. See *Commonwealth* v. *Delaney,* 425 Mass. 587, 589-592 (1997), cert. denied, 118 S. Ct. 714 (1998), in which the principle is explicated.

Beyond application of the *Delaney* principle, Chartier's response when reminded by Manuel of the stay away order was, "Prove it. Prove it. You could never prove it." The jury could have taken that response as an admission that Chartier was

aware of the restraining order." Cf. *Brown* v. *Commonwealth*, 407 Mass. 84, 90 (1990).

(b) *As to malicious destruction of property.* There was evidence that Chartier (i) was close to the Botelho car about the time it was damaged; (ii) ran from the Botelhos when he saw them; (iii) was upset and angry about the breakup with Botelho; (iv) had been harassing Botelho and her family for over a year prior to the windshield incident; and (v) had responded, "Prove it, prove it," when accused by Manuel with breaking the car windshield. Stitched together, this was sufficient to get to the jury. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 200-202 (1977); *Commonwealth* v. *Anderson*, 396 Mass. 306, 313 (1985); *Commonwealth* v. *Doucette*, 408 Mass. 454, 461-462 (1990).

*Judgments affirmed.*